**E.P., Appellant,**

v.

**ALASKA PSYCHIATRIC INSTITUTE, Appellee.**

Nos. S–12853, S–12934, S–13004.

Supreme Court of Alaska.

April 24, 2009.

---

.

Douglas Moody, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant.

David T. Jones, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

CARPENETI, Justice.

# I. INTRODUCTION

A person addicted to various substances, whose substance abuse has caused organic brain damage, appeals his three consecutive involuntary commitments to Alaska Psychiatric Institute. We uphold his commitments, because: (1) Alaska statutes permit involuntary commitment of a person found likely to harm himself even if there is no reasonable belief treatment will improve his condition; (2) an addict whose substance abuse has caused organic damage to the frontal lobe of his brain rendering him unable to understand the dangers of his substance abuse, and impeding his ability to communicate, is "mentally ill" under Alaska's involuntary commitment statutes; (3) where the addict intends to return to the substance abuse that causes his organic brain damage if released from involuntary commitment, the addict is "likely to cause harm to himself" and "demonstrates a current intent to carry out plans of serious harm" to himself under Alaska's involuntary commitment statutes; and (4) the superior court's decision to treat the addict's objections to the masters' reports as motions for reconsideration of superior court orders was harmless error.

# II. FACTS AND PROCEEDINGS

## A. Introduction

A brief description of the statutory scheme governing involuntary commitment in Alaska may assist the reader in understanding the involved procedural history of this case. Alaska Statute 47.30.655 discusses "principles of modern mental health care" guiding the statutory scheme for involuntary commitment, including the principle "that persons who are mentally ill but not dangerous to others be committed only if there is a reasonable expectation of improving their mental condition." Alaska Statute 47.30.730 allows the state to petition to involuntarily commit for thirty days a person who "is mentally ill and as a result is likely to cause harm to self or others or is gravely disabled." The petition must "allege with respect to a gravely disabled respondent that there is reason to believe that the respondent's mental condition could be improved by the course of treatment sought." Under AS 47.30.740 and AS 47.30.770, the state may petition for an additional 90–day commitment after a 30–day commitment, and an unlimited number of 180–day commitments after a 90–day commitment. The same procedures apply to 90–day and 180–day commitments as to 30–day commitments, except for a few additional requirements.

## B. Facts

E.P. has a history of alcohol abuse and inhaling gasoline fumes and other substances to get high ("huffing"). These actions have

led to several commitments, both voluntary and involuntary to the Alaska Psychiatric Institute (API). Huffing has damaged the frontal lobe of E.P.'s brain, resulting in dementia, personality disorder, and not otherwise specified psychosis. He has poor judgment and insight, and as a result cannot grasp the severe health consequences of huffing. E.P. is addicted to huffing.

E.P. stayed at API voluntarily from March until May 2007. In May 2007 API discharged E.P. to an assisted living facility in Big Lake. Within twenty-four hours, he got drunk, huffed gas, and became "assaultive" or "physical." The record is vague about this event. The police were involved in an unspecified way, but apparently E.P. was not charged with any crime. E.P. returned to API the next day. Throughout the current proceedings, E.P. has maintained that, if discharged from API, he will likely go back to huffing. The parties do not dispute that API does not have the capability to treat or improve his substance abuse problem: Commitment there can only prevent him from huffing by restricting his access to gasoline and other inhalants.

### C. Proceedings

#### 1. The 30–day commitment

In August 2007 E.P. decided he wanted to leave API. API petitioned to commit him involuntarily for thirty days. Standing Master Andrew Brown heard the petition on August 3, 2007. Dr. Kahnaz Khari of API testified for API, and E.P. testified on his own behalf.

Dr. Khari testified that huffing gas has damaged E.P.'s frontal lobe, and that huffing has caused his mental health problems. She testified that as a result of this damage, he lacks insight and judgment and cannot understand how huffing gas harms him. She testified that she did not expect E.P.'s condition to improve at API because API is not a substance abuse treatment facility. She testified that E.P. should stay at API because API restricts his access to alcohol and inhalants. She also testified that E.P. had a history of drinking, huffing gas, and "becom[ing] assaultive" when not at API. She

testified that E.P. has been a model patient during his stay at API.

E.P. testified briefly that he wanted to go back to his family. When asked if he would go back to drinking and huffing gas if discharged, he replied: "If I relapse I will.... Yeah, if I get bored I will do like I did ... the last time." His testimony was confused and garbled.

The standing master found E.P. mentally ill and as a result gravely disabled. He declined to find E.P. a danger to himself or others. E.P.'s lawyer told the master that she planned to object to his report. The standing master then issued a written report. He found that E.P.'s substance abuse had caused organic brain damage and resulting dementia. He wrote: "[E.P.] cannot perceive and understand reality. His judgment is extremely poor and he is unable to make rational decisions, as shown by his continued desire to inhale toxic substances. If he is in any type of an unsecured setting he will resume inhaling toxic substances." He acknowledged that the only benefit API could provide E.P. was a secured setting. The superior court judge signed the recommendation the next day.

The day after that, E.P. filed objections to the master's report. He argued that the statutes only allow involuntary commitment of a gravely disabled person if there is reason to believe treatment will improve that person's condition, and that treatment will not improve his condition.

API responded, and agreed with E.P.'s factual assertions and legal argument. But API argued that, although involuntarily committing E.P. for grave disability was not appropriate, the record supported involuntarily committing E.P. on the grounds that he was likely to harm himself or others. API wrote:

> The evidence is clear that [E.P.] intends to return to his home village and resume his drug use. If left untreated and allowed to resume his old habits, which is his current plan, he will die. His sister, with whom he intends to reside[,] has small children who are at risk of being influenced by his behaviors, and harmed as a result.

The superior court received the objections and response after signing the master's report, and therefore treated the objections as a motion for reconsideration of a superior court order. The superior court then denied the motion "[f]or the reasons stated in [API]'s Response to objections." The superior court did not elaborate. E.P. appealed to this court.

### 2. The 90–day commitment

When E.P.'s 30–day commitment ran out, API petitioned for a 90–day involuntary commitment on the on the alternative grounds that (1) E.P. was gravely disabled or (2) he was likely to harm himself or others. Standing Master Andrew Brown held a hearing on the petition on September 5, 2007. Dr. Khari was the only witness. The fact findings from the 30–day commitment were admitted as evidence. Dr. Khari testified that E.P.'s condition had not improved since the 30–day commitment hearing. But she testified that he was a model patient, and had exhibited no dangerous behavior. She testified that he still planned to continue huffing gas if discharged, which would further damage his brain. Dr. Khari also testified that E.P.'s verbal communication is limited. "[A]fter ... a couple of sentences, he usually turns around and gives you a smile, that's something actually not appropriate in the context of what we are talking [about]." The master committed E.P. on grounds of grave disability.

Again E.P.'s lawyer told the master she intended to object to his report. But again the master sent his report immediately to the superior court, which signed it before the ten-day period for objections had run. E.P. made similar objections to those he made in the thirty-day proceeding. This time he added the argument that AS 47.30.655(6) requires a reasonable belief that treatment will improve a person's condition if the person is gravely disabled *or* if the person is likely to harm himself. He argued that he can only be involuntarily committed without reasonable belief that treatment will improve his condition if he is found likely to harm others.

API responded, again agreeing with E.P.'s legal conclusions.[1] But API argued that the record showed E.P. was likely to harm others. API reiterated its concerns that if E.P. returned to his sister and resumed huffing, he would likely die. API also worried he might influence her children, thus harming them. API also expressed generalized concern that "other people could be harmed as a result of his choice to drink and abuse substances."

The superior court, having already signed the master's report before the end of the ten-day period to object, again treated E.P.'s objections as a motion for reconsideration. The superior court denied the motion on the grounds that E.P. was likely to harm himself because of his plan to huff gas if discharged. The superior court held that the statute does not require a reasonable belief that treatment will improve the condition of a person likely to harm himself. E.P. again appealed to this court.

### 3. The 180–day commitment

When E.P.'s 90–day commitment ran out, API petitioned for a 180–day commitment on the alternative grounds that (1) E.P. was gravely disabled, or (2) he was likely to harm himself or others. Standing Master Jonathon Lack heard the matter on December 4, 2007. Again, Dr. Khari was the only witness. Again Dr. Khari testified that E.P. intended to huff gas if released, and that when intoxicated "his behavior become (sic) very assaultive, very unpredictable." She mentioned the May 2007 incident in which E.P. "abused alcohol and huffing and [became] physical and police became involved." But she also testified that he had not shown any aggressive or self-destructive behavior—other than a continued desire to huff gas—since coming to API. She again testified that his mental condition impairs his judgment and prevents him from appreciating the dangers of huffing.

The standing master found E.P. to be both gravely disabled and a danger to himself. In his written report, the master found:

---

1. On appeal, API asserts it erred in agreeing with E.P.'s legal conclusion about AS 47.30.655(6).

[E.P.] suffers from psychotic disorder and persisting dementia caused by substance abuse and manifesting itself in additional substance abuse. He has limited cognitive function and has no insight or judgment into his condition and by clear and convincing evidence the court finds that he is a risk to himself due to his condition. He represented to Dr. Khari that if released he would continue to seek out materials to "huff" which represents a serious irreparable threat to his health and safety. By clear and convincing evidence the court also finds that [E.P.] is gravely disabled.

Again E.P.'s lawyer told the master she would object, and specifically requested that he hold his report for the full ten-day period before sending it to the superior court. The clerk assured her the report would be held, but in fact the superior court signed it just three days later.

Again E.P. objected to the master's report. E.P. reiterated his arguments made in the hearing and his previous objections. API filed a response similar to its previous responses.

Again the superior court treated the objections as a motion for reconsideration. The superior court found clear and convincing evidence that E.P. was likely to harm himself. "The evidence demonstrates his condition is far more than a substance abuse addiction. He is mentally ill and suffers [from] mental disorders described by Dr. Khari that manifest in his desire to 'huff.'" The court found insufficient evidence that E.P. was likely to harm others. The court also held that committing E.P. on the basis of grave disability was inappropriate because there was no reasonable belief E.P.'s condition would improve with treatment.

E.P.'s lawyer then filed a "motion to clarify court's decision to treat [E.P.]'s objections as a motion to reconsider." She pointed out that, according to Alaska Probate Rule 2(f), she should have ten days to file objections to the master's report, and asked how she was supposed to do that if the master sent the report directly to the superior court to sign. The court responded that, because masters' orders are immediately effective, it "makes far more sense" to sign them immediately and treat objections as a motion to reconsider. The court noted that the time for filing a motion to reconsider is also ten days.

E.P. appealed. E.P.'s appeals from his 30–day, 90–day, and 180–day commitments have been consolidated before this court.

## III. STANDARD OF REVIEW

 We review fact findings in an involuntary commitment proceeding for clear error.[2] We overturn those findings only if left with a firm conviction the standing master or superior court made a mistake.[3] We review questions of law *de novo*, including whether the fact findings meet the statutory standards for involuntary commitment.[4] We also review questions of statutory interpretation *de novo*.[5]

## IV. DISCUSSION

### A. Although This Case Is Now Moot, It Falls into the Public Interest Exception to Mootness.

 All three commitments from which E.P. appeals have expired.[6] Therefore, all the appeals are moot.[7] Although we generally decline to hear moot cases, we conclude that the public interest exception to mootness applies to the questions raised here. We consider three factors in evaluating

**2.** *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007).

**3.** *Id.*

**4.** *Id.*

**5.** *Id.*

**6.** The 30–day commitment expired in September 2007, the 90–day commitment expired in December 2007, and the 180–day commitment expired

in June 2008. We were also recently advised by counsel that E.P. passed away following submission of the case for decision. On E.P.'s behalf, counsel moved for decision on the grounds of the public interest exception to mootness. API did not oppose the motion.

**7.** *See Wetherhorn*, 156 P.3d at 380.

whether the public interest exception applies to moot claims:

> (1) Whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine.[8]

All three factors in this case weigh in favor of review. First, because the disputed issues in this case do not depend heavily on E.P.'s unique facts, they are capable of repetition. When disputed issues turn on unique facts unlikely to be repeated, we have refused to find an exception to mootness.[9] But the questions E.P. raises depend on facts that may be repeated with regard to another in a similar situation. The matter of statutory interpretation—whether a court may involuntarily commit a person found dangerous to himself without also finding reasonable belief that his condition will improve with treatment [10]—does not depend on E.P.'s particular facts. E.P.'s procedural questions [11] also do not depend on his particular facts.[12]

The disputed issue—whether E.P. meets the statutory requirements for involuntary commitment—is capable of repetition with regard to other people whose drug addictions have damaged their brains. Before E.P.'s recent death,[13] they were not only capable of repetition with regard to E.P. himself, but they were repeated, because E.P. was committed three times on the same facts.[14]

Also, E.P.'s fact-based claims are capable of repetition to any addict whose substance abuse causes organic brain damage. Huffing gas and other inhalants, unfortunately, is not a rare addiction.[15] Other addictions may cause organic brain damage. For example, long-term use of methamphetamine may cause psychotic behavior and hallucinations.[16] Thus, this commitment process may be repeated with any drug addict whose addiction causes organic brain damage.

The second and third factors also weigh in favor of review. It is quite unlikely that an appeal from a 30–day or 90–day commitment, or even a 180–day commitment, could be completed before the commitment has expired. Also, the questions raised in this appeal are important to the public interest. We have agreed with the United States Supreme Court that an involuntary commitment is a "massive curtailment of liberty." [17] The interpretation and scope of involuntary commitment statutes affect the power of the state to curtail the liberty of any member of the public.

Because all three factors used to decide whether the public interest exception to the

---

**8.** *Id.* at 380–81 (quoting *Akpik v. State, Office of Mgmt. & Budget,* 115 P.3d 532, 536 (Alaska 2005)).

**9.** *See id.* at 381 (finding no exception to mootness doctrine where issue disputed was whether evidence presented at committed person's hearing met clear and convincing standard for involuntary commitment: "If it were to become necessary to seek Wetherhorn's commitment again, the hearing would be based on a different set of facts specific to different circumstances. It is unclear how two different hearings based on different facts and circumstances could be compared, and thus the factual questions are not capable of repetition.").

**10.** *See infra* Part IV.B.

**11.** *See infra* Part IV.E.

**12.** *See Wayne B. v. Alaska Psychiatric Inst.,* 192 P.3d 989 (Alaska 2008) (reviewing procedural issue appealed from an expired involuntary commitment).

**13.** *See supra* note 6.

**14.** *See* AS 47.30.770, "Additional 180–day commitment" ("Successive 180–day commitments are permissible on the same ground and under the same procedures as the original 180–day commitment.").

**15.** *See* National Institute on Drug Abuse, "NIDA InfoFacts: Inhalants," http://www.drugabuse.gov/Infofacts/Inhalants.html (2008) (last visited December 16, 2008).

**16.** *See* National Institute on Drug Abuse, "Methamphetamine," http://www.drugabuse.gov/DrugPages/Methamphetamine.html (last visited December 16, 2008).

**17.** *Wetherhorn v. Alaska Psychiatric Inst.,* 156 P.3d 371, 375 (Alaska 2007) (quoting *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972)).

mootness doctrine are satisfied, we conclude that we should review E.P.'s claims.

### B. A Person Can Be Committed for Grave Disability Only upon a Finding that Treatment Will Improve the Person's Condition.

In 1981 Alaska's involuntary commitment statutes underwent a major revision.[18] Alaska Statute 47.30.655 lays out the purposes behind the revisions. The central purpose "is to more adequately protect the legal rights of persons suffering from mental illness."[19] "In addition, the following principles of modern mental health care have guided this revision: ... (6) that persons who are mentally ill but not dangerous to others be committed only if there is a reasonable expectation of improving their mental condition."[20]

Relying on this statement of purpose, E.P. argues that, unless a court finds a person likely to harm others, it may involuntarily commit that person only if it finds that treatment will improve the person's condition. In other words, the court could not involuntarily commit E.P. on the grounds that he might harm himself unless it reasonably believed that treatment would improve his condition.

However, the substantive statutory scheme—as opposed to the statement of purpose—governing involuntary commitment does not require a reasonable belief that treatment will improve the person's condition when the person is likely to harm himself. Alaska Statute 47.30.730 establishes the procedure for a 30–day commitment.[21] Section (a) requires the petition to allege (1) "that the respondent is mentally ill and as a result is likely to cause harm to self or others or is gravely disabled," and (3) *"with respect to a gravely disabled respondent* that there is reason to believe that the respondent's mental condition could be improved by the course of treatment sought."[22] Thus, in the case of a mentally ill respondent, it is sufficient if the state shows that as a result of mental illness the respondent "is likely to cause harm to self." It is only with respect to a gravely disabled respondent that the state must show "that there is reason to believe that the respondent's mental condition could be improved by treatment"—referred to in this opinion with the shorthand description, "a likelihood that the respondent's condition could be improved by treatment."

██ We conclude that the statement of purpose found in AS 47.30.655(6) conflicts with the substantive statutes, and that the substantive statutes control.[23] The legislature's specific requirement that the state allege that a gravely disabled person's condition will improve indicates that no such requirement exists in the case of mentally ill persons likely to harm themselves or others. If the legislature intended to require that the state allege that mentally ill persons likely to harm themselves would be improved by treatment, it could have done so—as it did for gravely disabled people. We conclude that the state is not required to show a likelihood that, in the case of a mentally ill person who poses a danger to himself, treatment will improve his condition.[24]

E.P. tries to draw a parallel between the mentally ill who are gravely disabled and those who are likely to harm themselves. Relying on language in *Wetherhorn,* he ar-

---

18. AS 47.30.655.

19. *Id.*

20. AS 47.30.655(6).

21. Petitions for 90–day and 180–day commitments must meet all the requirements of petitions for 30–day commitments. AS 47.30.740(a); AS 47.30.770(a).

22. AS 47.30.730(1) and (3) (emphasis added).

23. *See Commercial Fisheries Entry Comm'n v. Apokedak,* 680 P.2d 486, 488 n. 3 (Alaska 1984) (noting that a statutory preamble "can neither restrain nor extend the meaning of an unambiguous statute; nor can it be used to create doubt or uncertainty which does not otherwise exist" (internal citations omitted)).

24. *See Rust v. State,* 582 P.2d 134, 139 n. 16 (Alaska 1978) *modified on other grounds,* 584 P.2d 38 (Alaska 1978) (noting that the state may commit a person likely to harm others under its police powers, commit a gravely disabled person under the state's *parens patriae* power, and commit a person likely to harm himself under a combination of both these state powers).

gues that the legislature intended involuntary commitment of gravely disabled people to protect them from themselves, and that this shows that the legislature intended to require a likelihood that treatment will improve the conditions of both gravely disabled people and people likely to harm themselves. But *Wetherhorn* distinguishes between those who are gravely disabled and those likely to harm themselves:

> The first finding, of "danger to self or others," is concerned with active forms of harm, where the respondent has demonstrated the affirmative ability or inclination to inflict harm to self or another person. The second finding [of grave disability] is concerned with a more passive condition, whereby the respondent is so unable to function that he or she cannot exist safely outside an institutional framework due to an inability to respond to the essential demands of daily life.[25]

■ We conclude that the statutory requirements [26] of a showing that treatment will lead to improvement apply only to gravely disabled persons.

Because the superior court repeatedly found no support for the proposition that treatment at API would improve E.P.'s condition, and the evidence strongly supports this finding, the court could not involuntarily commit E.P. on grounds of grave disability. And in fact, none of the superior court's three orders affirmed E.P.'s commitments on grave disability grounds. Although the standing masters all found E.P. "gravely disabled," the superior court orders affirmed E.P.'s commitment on the grounds he was dangerous to himself or others. Therefore, we consider whether E.P. was mentally ill and as a result likely to harm himself, or likely to harm others.

### C. E.P. Is Mentally Ill as Defined by Statute.

■ Alaska law permits involuntary commitment only of those who are gravely dis-

abled or likely to harm themselves or others as the result of mental illness.[27] Thus, the state may involuntarily commit E.P. only if he is "mentally ill" under the statutes. Alaska Statute 47.30.915(12) defines "mental illness" as:

> [A]n organic, mental, or emotional impairment that has substantive adverse effects on an individual's ability to exercise conscious control of the individual's actions or ability to perceive reality or to reason or understand; mental retardation, epilepsy, drug addiction, and alcoholism do not per se constitute mental illness, although persons suffering from these conditions may also be suffering from mental illness.

E.P.'s organic brain damage meets the first part of the statutory definition: as found by the superior courts, E.P. suffers from organic mental impairments affecting his judgment, perception of reality, and rational decision-making capabilities. The evidence supported those findings. The question is whether the statute's specific exception of "drug addiction" from the definition of "mental illness" means that E.P. is not mentally ill. We believe that it does not.

E.P.'s organic brain damage is a condition apart from, and more than, his drug addiction. While it is the result of his addiction, it has led to greatly impaired ability to exercise judgment, loss of perception of reality, and impaired ability to communicate. E.P. is not simply a drug addict, he has lost the capacity to appreciate the dangers of his addiction. Dr. Khari testified, and the superior court found, that because of cognitive damage, E.P. had little or no insight into the fact that huffing gas hurts him. His continued desire to huff gas stems not only from addiction, but also from his cognitive inability to understand his situation.

Thus, although drug addiction originally caused E.P.'s mental deficiencies, we conclude that the superior court did not err in

---

**25.** *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 376 (Alaska 2007) (citing *In Re LaBelle*, 107 Wash.2d 196, 728 P.2d 138, 144 (1986)).

**26.** *See* AS 47.30.730(a)(3) (30–day commitment); AS 47.30.740(a) (90–day commitment); AS 47.30.770(a) (180–day commitment).

**27.** AS 47.30.735(c).

finding E.P. mentally ill within the definition of the statute.

### D. E.P. Is Likely To Cause Harm to Himself.

■■ Although Alaska law allows commitment of mentally ill people "likely to cause harm to [self] or others,"[28] it does not define that term. Alaska Statute 47.30.915(10) defines "likely to cause *serious* harm." (Emphasis added.) Other involuntary commitment statutes use this language. For example, AS 47.30.675 requires that, when a person voluntarily commits himself, the treatment facility must notify him that the facility could initiate involuntary commitment proceedings against him if the facility determines he is "mentally ill and as a result is likely to cause *serious* harm to self or others or is gravely disabled." (Emphasis added.) Presumably this notice refers to a petition for 30–day commitment under AS 47.30.730, which does not use the word "serious." In the end, even though the definitional language of AS 47.30.915(10) (defining "likely to cause serious harm") is not identical to the commitment language of AS 47.30.735 (establishing commitment standard of "likely to cause harm to [self] or others"), we think the definitional language relevant to interpretation of the commitment language.

Alaska Statute 47.30.915(10) defines "likely to cause serious harm" as:

A person who (A) poses a substantial risk of bodily harm to that person's self, as manifested by recent behavior causing, attempting, or threatening that harm; (B) poses a substantial risk of harm to others as manifested by recent behavior causing, attempting, or threatening harm, and is likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person; or (C)

manifests a current intent to carry out plans of serious harm to that person's self or another.

Similarly, the commitment statutes require petitions for 90–day and 180–day involuntary commitments to allege that a person not gravely disabled:

has attempted to inflict or has inflicted serious bodily harm upon [himself] or another since [his] acceptance for evaluation, or that [he] was committed initially as a result of conduct in which [he] attempted or inflicted serious bodily harm upon [himself] or another ... or that [he] demonstrates a current intent to carry out plans of serious harm to [himself] or another.[29]

While we have not yet interpreted "likely to cause harm," we have distinguished it from "gravely disabled." As discussed above, in *Wetherhorn* we distinguished between those who are "gravely disabled"— risking harm from passive failure to secure their own basic needs—and those who are likely to harm themselves or others—risking harm from affirmative action.[30]

We conclude that E.P.'s continued intent to huff gas, as a result of his impaired judgment and understanding, meets the standards of AS 47.30.915(10)(A) and (C) and AS 47.30.740(a). The multiple masters' reports and superior court orders below all found that huffing gas damages E.P.'s brain and that E.P. will return to huffing gas if released from API. The evidence supported these findings. They all found that this intent to huff gas is something more than an addiction, and that it stems from his impaired ability to comprehend his condition. The superior court affirmed E.P.'s commitment on this ground at all three commitments.[31]

We conclude that E.P.'s intent to huff gas constitutes intent to cause himself bodily harm, and that it results from his mental

---

**28.** AS 47.30.735(c).

**29.** AS 47.30.740(a)(1); *see also* AS 47.30.770(a) (requiring petitions for 180–day commitments meet the requirements of AS 47.30.740(a)).

**30.** *Wetherhorn,* 156 P.3d at 376 (citing *In Re LaBelle,* 728 P.2d at 144).

**31.** The superior court affirmed the 30–day commitment for the reasons in API's brief, which included the claim that "[i]f left untreated and allowed to resume his old habits, which is his current plan, he will die." The superior court affirmed the 90–day and 180–day commitments on the grounds that E.P. was likely to harm himself by continuing to huff gas if released.

illness.[32] The superior court's finding that huffing gas damages the brain is supported by the evidence. The finding that E.P.'s intent to huff gas if released is the result of mental illness, rather than just an addiction, because of the damage to his brain that prevents him from perceiving the dangers of huffing, is likewise supported by the evidence. We distinguish this case from one in which an addicted person with full mental capacity chooses to continue abusing harmful substances, no matter how unwise one might consider that choice. In such a case, the person's intent to harm himself by abusing substances results from drug addiction alone, which the legislature excluded from the definition of "mental illness." In this case, E.P.'s decision to harm himself by abusing substances results from his brain damage, and therefore meets the statutory standards.

Because we find no error in involuntarily committing E.P. on the grounds that he is mentally ill and as a result likely to harm himself, we do not address whether E.P. may be committed on the grounds that he is likely to harm others.

### E. It Was Error To Treat the Objections to the Masters' Reports as Motions To Reconsider, but the Error Was Harmless.

At all three hearings, E.P. told the standing master he would object to the master's report, but at all three hearings the superior court signed the masters' reports before E.P.'s ten days to object had run. The reports then became superior court orders. When E.P. objected, the superior court treated the objections as motions for reconsideration of the superior court's order.

When E.P. asked the court to clarify the procedure, the superior court instead treated the objections as motions for reconsideration. The superior court pointed out that per Probate Rule 2(b)(3)(C), masters' orders are effective pending superior court review. The court noted that the time frame—ten days—is the same for filing both objections and motions for reconsideration. The court also noted that per Probate Rule 2(f)(2), a party can request that the superior court stay a master's order of commitment pending superior court review. E.P. argues that the superior court erred when it treated his objections to the masters' reports as motions for reconsideration, but API counters that any error was harmless. We agree with both parties.

Probate Rule 2(f) governs objections to a master's report.[33] Rule 2(f)(1) reads:

> Objections to a master's report or recommendation must be filed within 10 days of the date of notice of the report.... A reply to the objections must be filed within three days of service of the objections. The superior court may permit oral argument, order additional briefing or the taking of further evidence, or grant a hearing de novo.

Probate Rule 2(b)(3)(C) provides that "a master's order of commitment to a treatment facility is effective pending superior court review." Rule 2(f)(2) allows a party to request a superior court stay a master's order pending review of the order.

Civil Rule 77(k) governs motions for reconsideration. The time limit for filing is ten days after notice of the ruling. Under Rule

---

32. E.P. argues in his brief that API did not present clear and convincing evidence to meet the standard in AS 47.30.915(10)(A), which provides that a person is likely to seriously harm himself if he "poses a substantial risk of bodily harm to that person's self, as manifested by recent behavior causing, attempting, or threatening that harm." E.P. argues API presented no evidence of such "recent behavior." But that standard is only one of three standards under which a person can be found likely to seriously harm himself. The facts of E.P.'s case meet the alternative standard in AS 47.30.915(10)(C), that he "manifests a current intent to carry out plans of serious harm" to himself. The focus of Dr. Khari's testimony, and of the superior court findings, was what E.P. intended to do in the future. E.P. also argues that API did not present clear and convincing evidence E.P. intended to huff gas if released from API because E.P. testified that he might "relapse." E.P. argues this indicates that he intends to try not to huff gas, but recognizes he might fail in that attempt. We reject this argument because Dr. Khari repeatedly testified that E.P. intended to huff gas if released, and the trial court determined that she was credible.

33. According to Probate Rule 1, the probate rules apply to involuntary commitments under AS 47.30.

77(k)(1), a party may only move for reconsideration on the following grounds:

> (i) The court has overlooked, misapplied or failed to consider a statute, decision or principle directly controlling; or (ii) The court has overlooked or misconceived some material fact or proposition of law; or (iii) The court has overlooked or misconceived a material question in the case; or (iv) The law applied in the ruling has been subsequently changed by court decision or statute.

A party moving for reconsideration must specify the grounds for reconsideration.[34] Also, the party must "specifically designate that portion of the ruling, the memorandum, or the record, or that particular authority" that the moving party wants the court to consider.[35] The motion and supporting memorandum are limited to five pages.[36] The non-moving party may not respond unless asked to do so by the court.[37] No oral argument is allowed.[38] If the superior court does not rule on the motion in thirty days, it is deemed denied.[39]

It was error here to treat E.P.'s objections to the master's reports as motions for reconsideration. First, a motion for reconsideration is more limited than objections to masters' reports: A motion for reconsideration is limited to narrow grounds and cannot exceed five pages. Second, it is a different mechanism for a party to bring objections to the court's attention. These two procedures give a party subject to commitment proceedings two opportunities to object: a party can first make a broad-based objection to the master's report on any grounds, and then it can make a narrower objection to the superior court's order on specified grounds. These distinct procedures are particularly important in a case like E.P.'s where the superior court reached its conclusions on grounds different from those relied on by the masters. A party is entitled to both object to the master's report and to move for reconsideration from the superior court's order, especially when the superior court's order differs from the master's report.

We agree with E.P. that a motion for reconsideration is a poor substitute for objections to a master's report because motions for reconsideration are so limited. Treating objections to masters' reports as motions to reconsider restricts the moving party to five pages and limited grounds to object when the party should have had unlimited pages, a response from the opposing party, an opportunity for oral argument, and, where appropriate, a *de novo* hearing.

 But in this case we also agree with API that the superior court's error was harmless. The superior court did not limit E.P. to five pages, it accepted API's response, and even allowed E.P. to reply to API's response after the 180–day commitment hearing. Furthermore, E.P. did not ask the superior court for a *de novo* hearing. E.P. also had multiple opportunities to make his arguments before the superior court because of the three consecutive hearings. In fact, E.P. made substantially similar arguments after each hearing. Therefore it does not appear that E.P. had additional arguments he was unable to make before the superior court. Thus, any error in the procedure employed was harmless.

## V. CONCLUSION

Because E.P. is likely to harm himself as a result of his mental illness, the statutes do not require the court to find that treatment will improve his condition in order to involuntarily commit him. Any error in treating E.P.'s objections to the masters' report as motions for reconsideration was harmless. For these reasons, we AFFIRM E.P.'s commitments.

---

34. Alaska R. Civ. P. 77(k)(2).

35. *Id.*

36. *Id.*

37. Alaska R. Civ. P. 77(k)(3).

38. Alaska R. Civ. P. 77(k)(4).

39. *Id.*