NOTICE

*Memorandum decisions of this court do not create legal precedent.  A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) Supreme Court No. S-17393 |
| MASON J. | ) Superior Court No. 1JU-19-00041 PR ) ) MEMORANDUM OPINION ) AND JUDGMENT* ) ) No. 1774 – June 10, 2020 ) |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Daniel Schally, Judge.

Appearances:  Sharon Barr, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Mason J. Lael Harrison, Assistant Attorney General, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska.

Before:  Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I.    INTRODUCTION

A young man appeals a 30-day involuntary commitment order for mental health treatment.  He argues that the superior court erred when it found that he was likely to cause harm to himself or others due to mental illness and that there was no less restrictive treatment alternative.  Because the superior court's findings were supported

---

\*        Entered under Alaska Appellate Rule 214.

by clear and convincing evidence and satisfy the statutory criteria, we affirm the court's commitment order.

## II. FACTS AND PROCEEDINGS

### A. Facts

In 2012 Mason J.[1] had a psychotic episode while away at college. He returned home to Juneau for treatment under Dr. Joanne Gartenberg's care. Dr. Gartenberg attributed the episode to drug psychosis but believed that it could be "a harbinger of something more serious." Mason was compliant with his treatment, which included medication.

Over the next several years Mason traveled and continued pursuing his education. In November 2018 he completed a respiratory therapy degree program, returned to Juneau to find work, and passed one of two required examinations for board certification. In the meantime, however, his parents noticed that he was exhibiting some "unusual behavior," was "[k]ind of paranoid," and had become argumentative, irritable, and "more erratic emotionally." He was sometimes "explosive" and believed "something sinister" was going on in Juneau. He felt the world was a "very dangerous" place and asked his parents to buy him a gun for family protection, particularly against burglars.

On January 29, 2019, Mason visited the emergency room to address an unrelated medical concern. The lab work was normal and a drug screening was negative, but the doctor diagnosed Mason with paranoid schizophrenia. Mason visited Dr. Gartenberg the next day, and she too diagnosed him with paranoid schizophrenia. She found he had changed: he no longer wanted medication, "did not think there was anything wrong" with him, and only attended the appointment "because his parents wanted him to."

---

[1] A pseudonym has been used to protect Mason's privacy.

Testimony at the commitment hearing described an incident later the same day. According to Dr. Helen Short, who was Mason's treating psychiatrist at Bartlett Regional Hospital, Mason kicked the family dog when it "went after his dog" during a family discussion. This frightened Mason's parents, causing them to "kind of jump[] up"; Mason reacted by "jump[ing] up with his fists." His parents felt "very threatened" and called the police. Mason left his parents' house but was soon arrested. His parents looked in his room and found that he had rigged a 35-pound weight above the stairwell so he could pull a string and have it fall on someone. They also found a blowtorch and two Molotov cocktails — glass bottles filled with gasoline with rags as wicks. Around Mason's bed he had hung curtains which appeared to have been cut into strips with a machete.[2]

Mason's father filed a petition seeking Mason's emergency hospitalization for evaluation. A clinical psychologist evaluated Mason and recommended that he be hospitalized at Bartlett Regional Hospital "until [his] present issues can be addressed"; a superior court judge granted the petition. Soon after, Dr. Gartenberg and Dr. Short petitioned for Mason's 30-day commitment. Having observed him during the 72-hour evaluation period, they asserted that he was mentally ill and likely to harm himself or others.

## B.    Proceedings

The 30-day commitment petition was filed on February 6, 2019, along with a petition for court-ordered administration of psychotropic medication. The superior court held a hearing on the commitment petition the next day. The court heard testimony from Dr. Short, Dr. Gartenberg, and Mason.

---

[2]    Dr. Short testified that she believed that Mason had a machete "in his room or easy access to [one]."

Dr. Short testified that Mason's "suspicions that something sinister has been going on" were consistent with a diagnosis of paranoid schizophrenia. She described Mason's journal entries, in which he speculated that his parents were "white supremacists" who were "trying to have him sacrificed or killed"; she also described photos provided by Mason's parents that showed the 35-pound booby trap, the blowtorch, and the Molotov cocktails. She described Mason's suspicions that hospital cameras were tracking him and his belief that if "he t[ook] medication, that . . . w[ould] just prove to people" that he had paranoid schizophrenia. She also noted his complaint that someone entered his room at night and took his radio, which was disproved by a review of hospital security camera footage.

Dr. Short noted that Mason had been "functioning really well on the unit" in the three days before the hearing but that he "absolutely" had an incentive to hide any issues. She testified that he was "very engaging," "bright," and "articulate" but had a tendency to "track off and not really answer" direct questions. Her "independent assessment" of his condition was that if he remained untreated his delusions of persecution would get worse. She acknowledged that he was likely to be "pretty stable" over a short period of time, but she testified that without medication he would "continue to have a pretty significant deterioration" and that if he felt threatened by others he would react, possibly "in a very violent way depending on what he thinks is going on."

According to Dr. Short, "the primary treatment" for Mason's schizophrenia was medication, and a 30-day hospitalization would not make a difference without it. She later explained that there is a "big push in the psychiatric and mental health community . . . for early intervention for psychotic episodes" because educating patients about their illness, its symptoms, and possible medications — while also providing intensive support — is effective in treating it. Dr. Short testified that even if Mason left

Juneau[3] his problems would follow him because the "issue isn't Juneau. It is in his mind." She acknowledged on cross-examination that Mason had been able to get by on his own in the past and that he might be able to function on the "margins" of society, but this did not change her view that involuntary commitment was currently his only viable option.

Like Dr. Short, Dr. Gartenberg testified that Mason suffered from paranoid schizophrenia. She testified that he was "very polite and articulate," but when answering questions he was "vague." She said that Mason's emergency room visit had a "very paranoid flavor" because he thought someone had poisoned him. She testified that medication on an outpatient basis would be "ideal in everybody's world" as a treatment option, but, because Mason was opposed to such a regimen, involuntary commitment was "the least restrictive alternative right now."

Mason was the final witness. He described "feelings of . . . paranoia" and instances when he would "misinterpret" voices or the wind as "being aggressive" and using "language that wasn't there." He testified that he never hurt anyone but would "channel [his] aggression" through exercise. He also described his 2012 treatment and how the anti-psychotic medication made his symptoms "kind of disappear[]."

Mason testified that the arsenal in his room was "for peace of mind" because he was "concerned [about] burglaries." When asked how he would protect himself with a Molotov cocktail without burning down his parents' house, he replied, "I would have just held it in the air maybe — I don't know." He denied making allegations about the hospital cameras: "I never said that. That's not true," but then reversed course: "I did ask the staff . . . about this . . . concern . . . . I wanted to know . . . what

---

[3] Dr. Short testified that Mason had "no clear plan" for himself if released; his intent was to "get on a plane" and go somewhere.

had happened and stuff. Nobody ever got back to me." He acknowledged that his claim that a staff member entered his room at night could have been a "bad dream."

At the close of the evidence the court found, by clear and convincing evidence, that Mason, "as a result of [his] mental illness, [was] likely to cause harm to others" and entered an oral order granting the 30-day commitment petition, followed by a short written order. The court observed that Mason had been doing well for a "significant period of time" but that his mental health "seems to have fallen apart in the immediate past here." The court based its finding that Mason was "suffering from a mental illness" on the "highly credible" testimony of Dr. Short and Dr. Gartenberg. It based its finding that Mason was likely to cause harm to himself or others on several factors, including the booby-trapped stairwell, his claim that his parents were white supremacists who intended to sacrifice him, and his "unusual" and "dangerous" personal safety plan for fending off intruders.

Four days later, on February 11, the court considered the petition for the involuntary administration of medication. After hearing testimony from the court visitor and Dr. Short, the court denied the petition, primarily because of the court visitor's testimony that Mason did not lack the capacity to give informed consent. The court advised Mason he was making a bad choice in refusing medication, "[b]ut it's one that legally you're free to make."

Mason appeals the 30-day commitment order.

III. STANDARD OF REVIEW

" 'Factual findings in involuntary commitment . . . proceedings are reviewed for clear error,' and we reverse those findings only if we have a 'definite and

firm conviction that a mistake has been made.' "[4] " '[W]hether factual findings comport with the requirements of AS 47.30[]' is a question of law that we review de novo."[5] We review "de novo the superior court's decisions and use our independent judgment to determine whether, based on [the] underlying factual findings made by the superior court, there was clear and convincing evidence" that involuntary commitment was in the respondent's best interest and was the least restrictive treatment option available.[6]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Finding That Mason Was Likely To Cause Harm To Others As A Result Of Mental Illness.

After a hearing, a court may "commit [a] respondent to a treatment facility for not more than 30 days if it finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others or is gravely disabled."[7] "Evidence is clear and convincing if it produces 'a firm belief or conviction about the existence of a fact to be proved.' "[8] "We have characterized this standard as 'evidence that is greater than a preponderance, but less

---

[4] *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019)).

[5] *In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1262 (Alaska 2019) (alteration in original) (quoting *Wetherhorn.*, 156 P.3d at 375).

[6] *Id.* at 1262 (remedying minor quotation error) (quoting *In re Hospitalization of Lucy G.*, 448 P.3d 868, 878 (Alaska 2019)).

[7] AS 47.30.735(c).

[8] *In re Luciano G.*, 450 P.3d at 1262-63 (quoting *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1193 (Alaska 2013)).

than proof beyond a reasonable doubt.' "[9]  This high standard reflects the fact that involuntary commitment represents a severe curtailment of a significant liberty interest.[10]

The commitment statute uses but does not define the phrase "likely to cause harm,"[11] so we look to the statutory definition of "likely to cause serious harm"[12] for interpretive help.[13]  A respondent is likely to cause serious harm if he or she "poses a substantial risk of harm to others as manifested by recent behavior causing, attempting, or threatening harm, and is likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person."[14]  When deciding whether this definition is satisfied, a court is to determine the respondent's current condition, but it "may consider the patient's recent behavior and condition as well as the patient's symptoms on the day of the hearing."[15]

---

[9]     *Id.* at 1263 (quoting *Stephen O.*, 314 P.3d at 1193).

[10]    *Stephen O.*, 314 P.3d at 1193.

[11]    *See* AS 47.30.735.

[12]    AS 47.30.915(12)(B).

[13]    *E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1110 (Alaska 2009) ("[E]ven though the definitional language of AS 47.30.915(10) (defining 'likely to cause serious harm') is not identical to the commitment language of AS 47.30.735 (establishing commitment standard of 'likely to cause harm to [self] or others'), we think the definitional language relevant to interpretation of the commitment language.") (second alteration in original).

[14]    AS 47.30.915(12)(B).  *See also* AS 47.30.915(12)(A) (providing that "likely to cause serious harm" includes a person who "poses a substantial risk of bodily harm to that person's self").

[15]    *In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1093 (Alaska 2011).

Mason argues that there was not clear and convincing evidence that he was likely to cause harm to himself or others as a result of mental illness because Dr. Short's projections were based on his future prognosis, "not his current status." He also asserts that he never acted violently toward another person or exhibited any aggression while being treated at Bartlett Regional Hospital prior to the hearing.

But nothing in the record leaves us with a definite and firm conviction that the superior court made a mistake in finding, by clear and convincing evidence, that Mason was likely to cause harm to himself or others as a result of mental illness.[16] The court explained that while Mason had been doing well for some time, his stability seemed "to have fallen apart in the immediate past." The court was most concerned with recent behavior: "[b]eing argumentative, irrational, threatening in nature;" experiencing paranoia; and getting into an altercation with his parents. The court also found that Mason's booby trap, blow torch, and Molotov cocktails were dangerous, especially "under the circumstances and in the manner described." The court noted that if Mason saw an intruder inside his house in the middle of the night and "toss[ed] a Molotov at him," then he's "going to burn [his] house down," risking serious injury to both himself and others.

While Mason had not yet committed an act of violence against a person, the language of the commitment statute is "forward-looking" given its ultimate goal of preventing harm that is "likely in the near future."[17] Dr. Short testified that if left

---

[16] *See In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1263 (Alaska 2019).

[17] AS 47.30.915(12)(B); *see also In re Hospitalization of Jeffrey E.*, 281 P.3d 84, 88 (Alaska 2012) (noting that statutory definition of "gravely disabled" "is forward-looking with its concern that [a] respondent 'will, if not treated, suffer or continue to suffer' distress as a result of" his mental illness (quoting AS 47.30.915(9)(B))).

untreated Mason would experience a "significant deterioration," and his delusions of being threatened by others could "cause him to react in a very violent way" because his feeling of persecution was very real. She testified that if she were Mason's parent, she would be "very concerned about" her "immediate safety." This concern for the immediate safety of others, and Mason's refusal to accept medication or participate in outpatient treatment, are what led both Dr. Short and Dr. Gartenberg to recommend involuntary commitment. The testimony is sufficient for us to conclude that the superior court did not err in finding that Mason was likely to cause harm to himself or others due to mental illness and that this finding was supported by clear and convincing evidence.

**B.     The Superior Court Did Not Err In Finding That There Was No Less Restrictive Alternative To Involuntary Commitment.**

A court may not order a 30-day involuntary commitment if a "feasible less restrictive alternative treatment is available."[18] The burden is on the petitioner to "prove by clear and convincing evidence that there is no less restrictive alternative to confinement."[19] "Least restrictive alternative" is defined as treatment facilities and conditions that "are no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient" and that "involve no restrictions on physical movement or . . . inpatient care except as reasonably necessary for the administration of treatment or the protection of the patient or others from physical injury."[20]

The superior court in this case found by clear and convincing evidence that a 30-day involuntary commitment was the least restrictive treatment option for Mason.

---

[18]     *In re Hospitalization of Matter of Naomi B.*, 435 P.3d 918, 932 (Alaska 2019).

[19]     *In re Luciano G.*, 450 P.3d at 1265.

[20]     AS 47.30.915(11)(A)-(B).

Mason challenges this finding, relying primarily on the superior court's later denial of the petition for the involuntary administration of medication. Because Dr. Short testified that hospitalization was necessary to ensure that Mason received the medication he needed to get well, and because — having been found competent to refuse medication — Mason would not be medicated during his hospitalization, Mason argues that "there was no reason to detain him at API . . . for 30 days."

We have held, however, that "the [S]tate is not required to show a likelihood that, in the case of a mentally ill person who poses a danger to himself [or others], treatment will improve his condition."[21] The statutory definition of "least restrictive alternative" allows restrictions not just as "reasonably necessary for the administration of treatment" but also "as reasonably necessary for . . . the protection of the patient or others from physical injury."[22] Thus, even if the doctors could not say that Mason's condition would be improved by hospitalization, the court could find that commitment would keep others safe from harm in the event his delusions suddenly worsened and he decided to use the weapons he had surrounded himself with at home.

Additionally, Dr. Short testified that Mason could benefit from "wrap-around community services, which involve lots of education about the illness," including his symptoms and possible options for medication. It is undisputed that Mason had benefitted from medication in the past; he acknowledged that the psychotic symptoms he suffered in 2012 disappeared as he was being treated with antipsychotic drugs. The court could reasonably conclude from the medical testimony that during the course of Mason's 30-day commitment he would again accept the benefits of

---

[21] *E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1108 (Alaska 2009).

[22] AS 47.30.915(11)(A)-(B).

medication.[23] We conclude that the superior court did not err in finding that involuntary commitment was the least restrictive treatment alternative.

## V.       CONCLUSION

We AFFIRM the superior court's 30-day commitment order.

---

[23]       *See In re Hospitalization of Connor J.*, 440 P.3d 159, 167 (Alaska 2019) (noting that involuntary commitment may be the "least restrictive alternative . . . that at least keeps the patient safe while his providers attempt treatment").