*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-16654 |
| LUCIANO G. | ) ) ) ) ) ) ) | Superior Court No. 3AN-17-00250 PR O P I N I O N No. 7415 – October 17, 2019 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: Megan R. Webb, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. David T. Jones, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee State of Alaska.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

CARNEY, Justice.
STOWERS, Chief Justice, dissenting.

## I.     INTRODUCTION

A man appeals the court order involuntarily committing him for mental health treatment. He argues that the court erred in making two findings: (1) that as a result of his mental illness he posed a risk of harm to others and (2) that there was no less restrictive alternative to committing him to the Alaska Psychiatric Institute (API). He

contends that his conduct did not meet the statutory criteria of "likely to cause serious harm" and that there was insufficient evidence presented that there was no less restrictive alternative for his treatment. Because the superior court's findings were supported by clear and convincing evidence and the superior court properly determined that the man's conduct met the statutory criteria, we affirm the commitment order.

## II.    FACTS AND PROCEEDINGS

Anchorage airport police took Luciano G.[1] into emergency custody and transported him to the psychiatric emergency department at Providence Alaska Medical Center for emergency detention and evaluation.[2]  Providence filed a petition for evaluation the same day; the petition was granted and Luciano was transported to API for evaluation.  A few days later API staff filed a petition to commit him to API for up to 30 days for further treatment.[3]

At a hearing to address API's petition, an airport police officer testified that Luciano had come to her attention after an airline employee had called to report a man was acting "irate" at the ticketing counter.  She said Luciano had repeatedly refused to state his destination before eventually naming Arizona, had instantly squared up and balled his fists when she contacted him, and had continued to clench his fists and tighten his shoulders even after he had been handcuffed.  The officer testified Luciano had both

---

[1]    A pseudonym has been used to protect the respondent's privacy.

[2]    AS 47.30.700-.725 prescribe the circumstances and procedures under which a person may be taken into emergency protective custody for evaluation.

[3]    *See* AS 47.30.735.  Neither the petition for hospitalization for evaluation nor the 30-day commitment petition was admitted into evidence at the commitment hearings.  Accordingly, we do not consider as evidence factual assertions in these petitions that were not testified to at the commitment hearings.  *See Paula E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 422, 430 (Alaska 2012).

carry-on bags and luggage to be checked located about 500 feet away from where she first made contact with him. She noted that one piece of the luggage was a gun case with no visible lock, which concerned her because "to fly with an airlines [sic] you have to have a locked, secured case for weapons to go underneath the aircraft." Officers took Luciano to their office. They took his luggage, including the case, for safekeeping and performed an inventory search. Inside the case were a rifle, two revolvers, and another handgun. Three of the guns were loaded. The officer testified: "One revolver had six bullets inside and it was aligned with the chamber[,] [a]nother revolver had five bullets inside," and the third handgun had a fully loaded magazine with a bullet in the chamber. Luciano also had 120 rounds of ammunition and a "load bearing vest"[4] in his other luggage.

Dr. Anthony Blanford, a psychiatrist at API, was called as an expert witness; he testified that he had spoken with Luciano four or five times since Luciano's admission to API. He testified that Luciano appeared to suffer from an unspecified psychotic disorder. Dr. Blanford stated that people he had interviewed described Luciano's recent behavior as very odd, especially in the last month, and that Luciano said that he had suffered a head injury as a result of a motor vehicle accident in the last month. Dr. Blanford noted Luciano had recently lost his job at the Veterans Administration (VA).

Dr. Blanford testified Luciano had been unwilling to talk to him about what happened at the airport other than to minimize the event and state it was just a misunderstanding. Dr. Blanford informed the court he had spoken to a person at the VA who described Luciano as engaging in an intense intimidating stare. Dr. Blanford testified Luciano had stared at him a couple of times and that the stare was "quite

---

[4]     The officer testified that a "load bearing vest" holds ammunition magazines.

intimidating where [Luciano] would stop cooperating and then just engage in a stare, without blinking." He testified he interpreted Luciano's stare as a threat. Dr. Blanford stated, "So when . . . [Luciano] started doing that[,] I actually asked him . . . what was he trying to do, intimidate[?] And he would say, well, why are you feeling scared, are you feeling frightened of me[?]" Dr. Blanford opined that Luciano's behavior at the airport reflected confused thinking and paranoia and that he would expect someone with Luciano's military background to know how to properly handle guns, including separating bullets from weapons. Dr. Blanford testified Luciano had told him that if he were released he wanted to go to Arizona to be near family, but that Luciano had refused to sign releases of information to enable API staff to confirm he could stay with family members.

Dr. Blanford stated that Luciano did not believe he had a mental health problem. Dr. Blanford did not believe Luciano would participate in outpatient treatment because Luciano "believes he didn't really do anything wrong when he arrived at the airport, and he didn't threaten anybody." Dr. Blanford testified he expected Luciano's symptoms would continue if not treated and that his head injury might have made things worse. On cross-examination Dr. Blanford conceded that Luciano had not made any verbal threats and that Luciano's behavior "at the worst, [had been] described as menacing, and intense . . . and not able to engage."

Dr. Blanford also expressed concern that Luciano planned to escape from API because he demonstrated "elopement behavior," including asking to go outside frequently and carrying all of his belongings around API in a bag. Dr. Blanford described two incidents: Luciano attempted to "pull the fire alarm" so that he might escape, and he was observed in the gym attempting to "leap right up on a wall about six to eight feet high." Dr. Blanford believed that "[Luciano was capable] of trying to leap the wall in the yard."

Luciano testified that after his discharge from the U.S. Army in 2015 he primarily worked as a security guard before obtaining a position at the VA as a medical support assistant. He testified that he left his job at the VA because he wanted to take a vacation. Luciano described the situation at the airport as "just a misunderstanding between [himself] and the airport clerk and the police." He conceded that his interaction with the police was "not good" and that he was frustrated by the police putting their hands on him.

Luciano testified that he was not aware of having any mental health diagnoses, but that he did have an adjustment disorder he "personally . . . classif[ied] . . . as a [traumatic brain injury]." He said he had suffered from too many head injuries to count and that he had not had treatment for many of those injuries. He described experiencing "[a] huge flash of light" countless times as a result of his head injuries and confirmed he had recently been in a motor vehicle accident.

Luciano stated he could see a doctor through the VA if he "wanted" to and agreed he was willing to be "evaluated" by the VA. But when asked whether he would be willing to take medication if recommended "for adjustment disorder, insomnia, some of the things [he was] struggling with[,]" he responded, "[P]ersonally . . . I believe . . . I don't need it." When questioned further by his lawyer, Luciano agreed that he was willing to see a doctor. But he testified he did not want to be at API and would prefer to see an outpatient provider.

Luciano stated that he never intended to harm anyone with the guns he had at the airport and that he did not at any point intend to harm himself. He also stated that he had not had any desire to harm anyone since he had been at API. He said if he were released he would go to a doctor's appointment scheduled for the next day and then he would want to get on a plane to go home. Luciano stated that if he were able to travel to Arizona, he would probably crash on his brother's couch, but acknowledged that his

brother was not expecting him.

On cross-examination Luciano admitted that he had received training about how to handle weapons while he was in the Army, but he stated that this had been his first time traveling at the airport as a civilian. He denied that his guns were loaded at the airport. Luciano agreed he had tried to stare down Dr. Blanford, but he could not remember asking if the doctor felt scared and denied that he had tried to stare down anyone else at API. He conceded that he had been balling his fists and squaring off to the officers at the airport, but said that he was not trying to send a message to the officers.

The magistrate found by clear and convincing evidence that Luciano was suffering from a mental illness based upon Dr. Blanford's testimony and the adjustment disorder diagnosis from the VA, and that the mental illness finding was corroborated by Luciano's current behavior and some of his own testimony. The magistrate stated that it appeared Luciano had suffered a "psychotic break."

The magistrate then considered "how much of an inference can be drawn from [Luciano's] showing up at the airport with loaded, unlocked guns and behaving in the manner that he did." She noted that she was particularly concerned by Luciano's denial that the weapons were loaded and believed that, given his military training and background, he would know not to come to the airport with loaded weapons. The magistrate stated that although she had not heard testimony of verbal threats, both the police officer and Dr. Blanford — professionals trained to assess these situations — testified they found Luciano's nonverbal behavior threatening. The magistrate found by clear and convincing evidence that Luciano was likely to cause harm to others as defined by the statute. This finding was, in part, based upon Luciano's apparent inability to assess and remember what was going on. The magistrate determined that there was no less restrictive alternative to confinement because there did not appear to be any place

for Luciano to go and because she did not believe that he would follow up on treatment if released.

The magistrate summarized the testimony of the police officer, Dr. Blanford, and Luciano in a proposed 30-day commitment order and emphasized the safety threat Luciano posed by arriving at the airport with loaded weapons. The proposed order noted that Luciano, by his own admission, was trained in the use of weapons; the court did not find credible his denial that the weapons were loaded, or that he had not known it was impermissible to bring unlocked loaded weapons when traveling by plane.[5] The order outlined the testimony regarding Luciano's aggressive attitude. The magistrate gave particular weight to testimony by Dr. Blanford and the officer that they found Luciano's behavior threatening because they "are professionals trained to assess behavior."

Luciano filed objections to the magistrate's proposed written findings the next day and requested a de novo hearing before the superior court. A few days later the superior court held an emergency hearing on Luciano's objections to the proposed 30-day commitment order.[6] The next day the court signed the 30-day commitment order, adopting the magistrate's proposed written findings.

Luciano appeals.

## III.    STANDARD OF REVIEW

" 'Factual findings in involuntary commitment . . . proceedings are reviewed for clear error,' and we reverse those findings only if we have a 'definite and

---

[5]    *See* 49 C.F.R. § 1540.111 (2018).

[6]    After the commitment hearing API filed a petition for court approval of administration of psychotropic medications. It was granted following another hearing and is not part of this appeal.

firm conviction that a mistake has been made.' "[7] "[W]hether factual findings comport with the requirements of AS 47.30," is a question of law that we review de novo.[8] "[W]e will review de novo the superior court's decisions and use our independent judgment to determine whether, based on the underlying factual findings made by the superior court there was clear and convincing evidence that involuntary [commitment] was in [respondent's] best interests and was the least intrusive available treatment."[9]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Finding By Clear And Convincing Evidence That Luciano Was Likely To Harm Others As A Result Of His Mental Illness.

Following a hearing, a court "may commit the respondent to a treatment facility . . . if it finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others."[10] Evidence is clear and convincing if it produces "a firm belief or conviction about the existence of a fact to be proved."[11] We have characterized this standard as "evidence that is greater than a

---

[7] *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007)).

[8] *Wetherhorn*, 156 P.3d at 375.

[9] *In re Hospitalization of Lucy G.*, ___ P.3d ___, Op. No. 7407 at 19, 2019 WL 4383926, at *8 (Alaska Sept. 13, 2019) (citing *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 250 (Alaska 2006); *see also id.* n.53 ("[T]hough the [best interests] answer must be fully informed by medical advice received with appropriate deference, in the final analysis the answer must take the form of a legal judgment that hinges not on medical expertise but on constitutional principles aimed at protecting individual choice." (quoting *Myers*, 138 P.3d at 250)).

[10] AS 47.30.735(c).

[11] *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1193 (Alaska 2013)
(continued...)

preponderance, but less than proof beyond a reasonable doubt."[12] A respondent is "likely to cause harm" if the respondent "poses a substantial risk of harm to others as manifested by recent behavior causing, attempting, or threatening harm, and is likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person."[13] We have previously stated, "The . . . finding, of 'danger to self or others,' is concerned with active forms of harm, where the respondent has demonstrated the affirmative ability or inclination to inflict harm to self or another person."[14]

Luciano argues that because he had not assaulted or attempted to assault anyone and had not verbally threatened anyone, the evidence was not sufficient to support a finding that he was likely to cause harm to himself or others. He focuses on the fact that there was no evidence that he made any verbal threats.

Luciano cites no legal authority to support his argument that we should narrowly interpret "threatening harm" to mean only verbal threats. Noticeably absent from the definition in the controlling statute in this case is the word "verbal."[15] The plain

---

[11]    (...continued)
(quoting *In re Johnstone*, 2 P.3d 1226, 1234 (Alaska 2000)).

[12]    *Id.* (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 530 n.12 (Alaska 2004)).

[13]    AS 47.30.915(12)(B); *E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1110 (Alaska 2009) ("In the end, even though the definitional language of AS 47.30.915(10) (defining 'likely to cause serious harm') is not identical to the commitment language of AS 47.30.735 (establishing commitment standard of 'likely to cause harm to [self] or others'), we think the definitional language [is] relevant to interpretation of the commitment language." (first alteration in original)).

[14]    *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 376 (Alaska 2007)).

[15]    AS 47.30.915(12)(B) (providing that risk of harm to others must be
(continued...)

language of the statute does not foreclose the superior court from considering and drawing inferences from nonverbal conduct seen as threatening rather than from just words.[16] Further, Luciano has not pointed to any legislative intent or rule of construction to support his narrow interpretation.

In addition the common usage of the word "threat" encompasses more than verbal threats. The American Heritage Dictionary of the English Language defines "threat" as "an expression of an intention to inflict pain, harm, or punishment."[17] It defines "threatening" as "making or implying threats."[18] Neither of these definitions requires that the expression be verbal for conduct to be considered a threat or threatening.

Luciano also challenges the inference that the superior court drew from the evidence presented at the commitment hearing. To address his challenge would require us to disturb the court's factual findings, and we will not disturb the superior court's factual findings unless we are left with a definite and firm conviction a mistake has been

---

[15]     (...continued)
evidenced "by recent *behavior* causing, attempting, or threatening harm") (emphasis added).

[16]     *Id.* While it is true that we do not look only to the plain meaning of a statute when engaging in statutory interpretation, "[w]here a statute's meaning appears clear and unambiguous . . . the party asserting a different meaning bears a correspondingly heavy burden of demonstrating contrary legislative intent." *State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016) (alterations in original) (quoting *Univ. of Alaska v. Geistauts*, 666 P.2d 424, 428 n.5 (Alaska 1983)).

[17]     *Threat*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2016).

[18]     *Threatening*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2016).

made.[19]  It appears that the magistrate largely credited the testimony of the officer and Dr. Blanford over Luciano's testimony, and the superior court endorsed the magistrate's factual determinations in adopting the proposed commitment order.

Testimony revealed that Luciano had been behaving erratically leading up to his leaving or being fired from the VA, that he acted irately at the airport with both the ticket agent and the officer, and that he had loaded weapons in a gun case with no visible lock.  The magistrate did not believe a former soldier like Luciano would be unaware of how to appropriately secure his weapons as required by regulation for air travel,[20] and noted her concern that he continued to insist that the guns had not been loaded.  Based in part on this determination she also found it was not credible that Luciano, who had arrived at the airport unticketed, carrying these unsecured and loaded weapons, and refusing to provide a destination, was there for the benign purpose of travel.  Both the officer and Dr. Blanford testified that they believed Luciano's behavior was threatening, and the officer characterized his actions of tightening his shoulders, balling his fists, and squaring up to her as "pre-assault indicators."  Dr. Blanford testified that the menacing behavior continued at API.[21]

---

[19]     *In re Hospitalization of Jacob S.*, 384 P.3d 758, 765-66 (Alaska 2016).

[20]     The Transportation Security Administration website states, "You may transport unloaded firearms in a locked hard-sided container as checked baggage only. Declare the firearm and/or ammunition to the airline when checking your bag at the ticket counter.  The container must completely secure the firearm from being accessed. Locked cases that can be easily opened are not permitted."  Transportation Security Administration, TRANSPORTING FIREARMS AND AMMUNITION, https://www.tsa.gov/travel/transporting-firearms-and-ammunition (last visited August 9, 2018); *see also* 49 C.F.R. § 1540.111 (2017).

[21]     The dissent characterizes Luciano's behavior as "ultimately" at page 19, or "essentially passive," at page 21, in contrast to the assessment of the superior court, and

(continued...)

The superior court was entitled to consider and credit all of this testimony; "[c]onflicting evidence is generally insufficient to overturn a fact finding, and we will not reweigh evidence if the record supports the court's finding."[22] Our task on appeal is rather to determine whether the superior court's findings, so long as they are not clearly erroneous, are sufficient when taken together to establish by clear and convincing evidence that Luciano was likely to cause harm to himself or others as a result of his mental illness.[23] We conclude that in this case they are: Luciano's arrival at the airport with unsecured and loaded firearms and his repeated refusal to name a destination, coupled with his physically aggressive body language, are enough to generate "a firm

---

[21]  (...continued)
of the two professionals on whose assessments the magistrate explicitly relied. But both the airport police officer's testimony and Luciano's own admissions establish that he was "balling [his] fists and squaring off against" an officer, conduct that goes beyond merely passive.

[22]  *In re Hospitalization of Jacob S.*, 384 P.3d at 766. We have repeatedly emphasized: "We defer to a superior court's credibility determinations, particularly when they are based upon oral testimony." *Id*. at 769 n.36 (quoting *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 930 (Alaska 2012)); *see also In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011); *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 274 (Alaska 2011); *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178 (Alaska 2009).

[23]  *See In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1194 & n.26 (Alaska 2013). The dissent suggests that the court erred by relying on Luciano's "ultimately passive," page 19, or "essentially passive," page 21, behavior, but as we have noted, Luciano's physical conduct and body language were not completely passive. Furthermore, this was not the sole basis for the court's finding; the court also relied, as it was entitled to do, on its assessment of the officer's and Dr. Blanford's — and Luciano's — credibility.

conviction or belief" that he posed a substantial risk of harm to himself or others.[24] We therefore conclude that the superior court's finding that Luciano was likely to harm himself or others because of his mental illness was supported by clear and convincing evidence.

**B.    The Superior Court Did Not Err In Finding By Clear And Convincing Evidence That There Was No Less Restrictive Alternative To Confinement.**

Luciano also appeals the superior court's finding that there was no less restrictive alternative to confinement at API. He argues that the evidence was insufficient to show what alternatives to confinement were considered and by whom, or why a less restrictive alternative was not viable.

The petitioner in an involuntary commitment proceeding must prove by clear and convincing evidence that there is no less restrictive alternative to confinement.[25] The term "least restrictive alternative" means that the treatment facilities and conditions "are no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient" and "involve no restrictions on physical movement nor supervised residence or inpatient care except as reasonably necessary for the administration of treatment or the protection of the patient or others from physical injury."[26]

The superior court in this case found that no less restrictive alternative existed because Luciano did not appear to have anywhere to stay and was unlikely to follow up with treatment if not committed. The evidence in this case supports these

---

[24]    *Id.* at 1193 (quoting *In re Johnstone*, 2 P.3d 1226, 1234 (Alaska 2000)).

[25]    *In re Hospitalization of Mark V.*, 375 P.3d 51, 58-59 (Alaska 2016).

[26]    AS 47.30.915(11).

findings: Luciano himself testified that he had no place to live, and Dr. Blanford stated that API staff were unable to verify that he would be able to stay with family due to his refusal to provide a release of information. Although Luciano argues that Dr. Blanford's failure to contact his treatment providers at the VA should preclude the court from finding that there was not a less restrictive alternative, the court clearly credited Dr. Blanford's testimony that Luciano was unlikely to seek treatment if released over Luciano's equivocal testimony that he would. [27] Whether his previous providers would have been willing to help him did not matter if Luciano would not seek their help. And Dr. Blanford testified he did not believe Luciano would participate in outpatient treatment. Dr. Blanford further testified that he believed Luciano's symptoms would continue if not treated. Dr. Blanford was also concerned that Luciano continually tried to leave API.

We have previously affirmed a superior court's finding that there was no less restrictive alternative based upon similar evidence. In *In re Hospitalization of Joan K.* we affirmed the superior court's finding that living with family was not a viable less restrictive alternative for a respondent because family members were not able to watch her 24 hours a day and because the respondent changed her mind rapidly about what she would or would not do if released.[28] We emphasized that the record showed that she "lacked perspective regarding her bipolar disorder" and that she denied having a mental illness or needing treatment.[29] In *In re Hospitalization of Mark V.* we similarly affirmed the superior court's less restrictive alternative finding where the record showed that a

---

[27] The dissent disagrees, page 16, but we defer to the magistrate's determination of credibility. *In re Jacob S.*, 384 P.3d at 769 n.36.

[28] 273 P.3d 594, 602 (Alaska 2012).

[29] *Id.*

respondent's need for medication and his inability to follow an outpatient regimen supported the magistrate's finding that no less restrictive alternative was available.[30]

To disturb the court's finding that there was no less restrictive alternative available for Luciano's treatment would require us to reweigh conflicting evidence, which we will not do as it is the province of the trial court to weigh testimony and make credibility determinations.[31] The record supports the superior court's underlying factual findings that Luciano lacked a place to live and would not seek treatment unless committed; these findings are sufficient to establish by clear and convincing evidence that no less restrictive alternative to commitment at API existed.

## V.    CONCLUSION

We AFFIRM the superior court's commitment order.

---

[30]    375 P.3d at 59-60.

[31]    *See In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011) ("We 'will grant especially great deference when the trial court's factual findings require weighing the credibility of witnesses and conflicting oral testimony.' " (quoting *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178 (Alaska 2009))).

STOWERS, Chief Justice, dissenting.

## I.     INTRODUCTION

The superior court ordered Luciano G.'s involuntary commitment to the Alaska Psychiatric Institute (API) because he brought unlocked and loaded weapons to the airport and because airport and API personnel viewed Luciano's behavior as threatening. The court did so on the theory that this showed Luciano to be a danger to others. By affirming this order today, I believe this court dangerously broadens Alaska's involuntary commitment statute, giving short shrift to Luciano's constitutionally protected liberty interests.[1] Finally, I conclude the superior court failed to adequately consider less restrictive alternatives to commitment at API. I therefore respectfully dissent from the court's opinion.

## II.    DISCUSSION

### A.     Luciano's Behavior Did Not Meet The Legal Standard Of "Likely To Cause Serious Harm."

The first question is whether the superior court erred in finding that Luciano was likely to cause harm to others as a result of his mental illness. Luciano argues that the evidentiary record does not support the superior court's finding, and that it was legal error to interpret the statutory standard so broadly as to permit involuntary commitment based on the evidence before the court.

As we have repeatedly emphasized, "[t]he United States Supreme Court has characterized involuntary commitment for a mental disorder as a 'massive curtailment

---

[1]      I also conclude that the magistrate judge and the superior court judge were clearly erroneous in finding that Luciano's behavior implied that he was threatening harm as that term is used in the commitment statute.

of liberty' that cannot be accomplished without due process of law."[2] "The Supreme Court has therefore determined that before a person can be involuntarily committed, the court must find in addition to mental illness either: (1) that the person presents a danger to self or others; or (2) that the person is 'helpless to avoid the hazards of freedom . . . .' "[3] The two requirements for commitment, which are reflected in Alaska's involuntary commitment statute respectively as "likely to cause harm" and "gravely disabled,"[4] derive from two independent state interests. As we explained in *Rust v. State*,

> [a] person who presents a danger to others is committed under the state's police power. A person who requires care and treatment is committed through exercise of the state's *parens patriae* power. One who poses a danger to *himself* is committed under a combination of both powers.[5]

The Supreme Court has repeatedly emphasized that a person may not be committed for treatment against his will unless one of these state interests is sufficiently strong to outweigh the respondent's constitutional right to liberty.[6] "The precise wording of these two additional requirements is left to the states, 'so long as they meet the constitutional

---

**2** *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375-76 (Alaska 2007) (first quoting *Humphrey v. Cady*, 405 U.S. 504, 509 (1972), then citing *Addington v. Texas*, 441 U.S. 418, 425 (1979)), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019); *see also In re Hospitalization of Gabriel C.*, 324 P.3d 835, 839 (Alaska 2014); *Rust v. State*, 582 P.2d 134, 139 (Alaska 1978).

**3** *Wetherhorn*, 156 P.3d at 376 (first citing *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975), and quoting *id.* at 574 n.9).

**4** AS 47.30.735(c); *see* AS 47.30.915(9), (12) (definitions).

**5** 582 P.2d 134, 139 n.16 (emphasis in original); *see also Addington*, 441 U.S. at 426.

**6** *See O'Connor*, 422 U.S. at 575-76; *Addington*, 441 U.S. at 426-27.

minimum.' "[7] Accordingly, although this case concerns a question of statutory interpretation, the correct interpretation of the statute necessarily includes an analysis of its constitutional limits.

Luciano's commitment was based solely on a theory that he was a danger to others. As such, the State's *parens patriae* power is not implicated in this case. The question before us is whether, on the evidence presented, the State could constitutionally invoke its police power to confine Luciano against his will by relying on the statutory standard of "likely to cause harm to others."

A respondent is "likely to cause harm" for the purpose of AS 47.30.730 if he "poses a substantial risk of harm to others as manifested by recent behavior causing, attempting, or threatening harm, and is likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person."[8] There is no indication in the record that Luciano ever caused harm or attempted to harm anyone. Thus, the key question is whether, under a clear and convincing evidence standard, Luciano's behavior was "threatening harm" to an extent that would evidence a substantial risk of harm to others.

The court points to the following as evidence that Luciano was "threatening harm": Luciano lost or left his job at the VA after a period of "behaving erratically"; he "acted irately at the airport"; his behavior in interactions with airport and API staff were viewed as "threatening" and "menacing"; and he had weapons in his luggage that were

---

[7]     *Wetherhorn*, 156 P.3d at 376 (quoting *Addington*, 441 U.S. at 431).

[8]     AS 47.30.915(12)(B); *see E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1110 (Alaska 2009).

loaded and not locked away as TSA regulations require.[9]

The court focuses narrowly on the issue whether the phrase "threatening harm," as it is used in AS 47.30.915(12)(B), is limited to verbal threats.[10] In doing so, the court overlooks the fact that Luciano made no threats at all, verbal or otherwise. During cross-examination, Dr. Blanford was asked whether Luciano had "made any threats to anyone [at API]." Dr. Blanford appears to have understood the question as referring to verbal threats, answering, "No, he has not made any verbal threats . . . ." But Dr. Blanford also continued, explaining that "*at the worst*, [Luciano is] described as menacing and intense," "not able to engage," and "[v]ery guarded." (Emphasis added.) Further, Dr. Blanford testified that he was not aware of Luciano making "threats to others or indications of desire to harm himself." The court also appears to find a "threat" in Luciano's tendency to clench his fists and stare at people.[11] But although Dr. Blanford testified that he *interpreted* this as a threat, Luciano's behavior was ultimately passive.

Citing the American Heritage dictionary, the court defines a "threat" as "an expression of an intention to inflict pain, harm, or punishment."[12] I find no indication

---

[9] Opinion at 10. I note that it was most certainly unwise for Luciano to enter the unsecured (i.e., non-sterile) airport area carrying his unlocked rifle case that contained an unloaded rifle, two loaded revolvers, and another loaded handgun. But he violated no TSA regulation. It is not until the passenger presents himself for TSA inspection of his person and accessible property before he enters a sterile area that he is prohibited from having a weapon on or about his person. *See* 49 C.F.R. § 1540.111(a), (c) (2019). There is no evidence in the record that Luciano presented himself for TSA inspection.

[10] Opinion at 10.

[11] Opinion at 3, 11.

[12] Opinion at 10 (quoting *Threat*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2016)).

in the record of Luciano expressing or even suggesting an intent to inflict pain, harm, or punishment on anyone. I also find nothing in the record that would materially dispute Luciano's testimony that he had no intent or desire to harm anyone, either during or after the incident at the airport.

I do not believe the involuntary commitment statute can be interpreted so broadly as to encompass Luciano's behavior in this case. In *Wetherhorn v. Alaska Psychiatric Institute*, we explained that the "danger to self or others" standard "is concerned with *active* forms of harm, where the respondent has demonstrated the *affirmative ability* or *inclination* to inflict harm to self or another person."[13]

In *Kansas v. Hendricks*, the Supreme Court explained that it is constitutionally permissible for a state "*in narrow circumstances* [to] provide[] for the forcible civil detainment of people who are *unable to control their behavior* and who thereby pose a danger to the public health and safety."[14] The Court's analysis in that case indicated that a permissible commitment statute is one that "narrows the class of persons eligible for confinement to those who are *unable to control their dangerousness*."[15]

The Ninth Circuit's opinion in *Suzuki v. Yuen*[16] is also relevant here. In that case, the Ninth Circuit concluded that portions of Hawaii's involuntary commitment statute were unconstitutional.[17] In language similar to Alaska's statute, Hawaii's statute authorized involuntary hospitalization for a person who "is mentally ill" and who "is

---

[13]     156 P.3d 371, 376 (Alaska 2007) (emphasis added).

[14]     521 U.S. 346, 357 (1997) (emphasis added).

[15]     *Id.* at 358, 364 (emphasis added).

[16]     617 F.2d 173 (1980), *aff'g in part Suzuki v. Alba*, 438 F. Supp. 1106 (D. Haw. 1977).

[17]     *Id.* at 174.

dangerous to himself or others."[18]  The district court had held that the constitutional standard for involuntary commitment "is that which requires a finding of imminent and substantial danger as evidenced by a recent overt act, attempt or threat," and had struck down the statute because it was "ambiguous" as to this standard.[19]  The Ninth Circuit affirmed the district court's ruling, adding that "*it is unconstitutional to commit one who does not pose an imminent danger*."[20]

In this case, it is clear from the record that Luciano never committed or attempted an act to cause harm to others, and he did not make any threats — that is, any expressions of an intent or desire to cause imminent harm.  And there is no indication in the record that Luciano was unable to control his behavior to prevent himself from acting violently.  On the contrary, Luciano's conduct was essentially passive:  he was withdrawn and "very guarded," and when forced to interact with airport and API staff he was not "unable to control [his] behavior,"[21] but merely tensed up, clenched his fists, and stared.[22]  Luciano's behavior was concededly unusual, and it is understandable that his behavior would be cause for concern to those who interacted with him.  I do not dispute that it was appropriate for airport police to take Luciano into emergency custody for evaluation, but I disagree that there was clear and convincing evidence to support

---

[18]     *Id.* at 175 n.2 (quoting Haw. Rev. Stat. § 334-60(b)(1) (1976)).

[19]     *Id.* at 178 (quoting *Suzuki v. Alba*, 438 F. Supp. at 1110).

[20]     *Id.* (emphasis added).

[21]     *Kansas v. Hendricks,* 521 U.S. 346, 357 (1997).

[22]     If the reader travels frequently on commercial airlines in the United States, I hazard a guess the reader has observed passengers standing in line for TSA screening or going through the TSA screening process tensed up, clenching their fists, and staring. While such behavior may result in additional TSA screening, it does not warrant involuntary commitment in a state mental institution.

involuntarily committing him for up to 30 days at a psychiatric institute.

"Loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior."[23] I believe that interpreting Alaska's involuntary commitment statute so broadly as to allow a finding on the facts of this case that Luciano was "likely to cause harm to . . . others" raises serious questions about the statute's constitutionality as applied to him. The State certainly "has authority under its police power to protect the community from the dangerous tendencies of [those] who are mentally ill,"[24] but in order to exercise this power and confine Luciano against his will, I would hold that the State was required to show that Luciano had "demonstrated the affirmative ability or inclination to inflict harm to . . . another person."[25] In this case, the State's showing was not sufficient under a clear and convincing evidence standard to satisfy this requirement.

---

[23]     *Addington v. Texas*, 441 U.S. 418, 427 (1979). As the Supreme Court in *Addington* explained:

> At one time or another every person exhibits some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable. Obviously, such behavior is no basis for compelled treatment and surely none for confinement. However, there is the possible risk that a factfinder might decide to commit an individual based solely on a few isolated instances of unusual conduct.

*Id.* at 426-27.

[24]     *Id.* at 426.

[25]     *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 376 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019).

My interpretation of the "likely to cause serious harm" standard is consistent with how that aspect of Alaska's involuntary commitment statute has typically been applied. Our jurisprudence in this area is not well-developed; indeed, we appear to have heard only four cases involving a commitment order based on a danger to others,[26] one of which we affirmed, while the other three were dismissed as moot. But in all four cases, the respondents' conduct was substantially more serious than Luciano's.

In *In re Jacob S.* the respondent was hospitalized after he stopped taking his medication and his domestic partner grew concerned that he was experiencing paranoid delusions and acting violently toward their neighbor.[27] At a hearing before a magistrate judge, both the partner and the neighbor testified about Jacob's behavior:

> Jacob's neighbor testified that Jacob had filed a restraining order against her in November 2014 alleging that she was stalking him, had broken into his house, and had been tasing him with a "stop gun." The neighbor also testified to her suspicion that Jacob had thrown a rock through her window and attempted to set fire to her house with a "Molotov cocktail" on two separate occasions the previous month.

> Jacob's partner testified that she recognized several bottles from the "Molotov cocktail" incident as having come from their house. She also testified that Jacob had been doing "strange things" and then did not remember what he had done, for example connecting an electric welder to their house's back door. He had unplugged the telephone then

---

[26] Several other cases have involved commitment orders based on a danger to self theory. *See, e.g.*, *In re Hospitalization of Daniel G.*, 320 P.3d 262, 265 (Alaska 2014); *In re Hospitalization of Joan K.*, 273 P.3d 594, 599 (Alaska 2012); *E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1104-06 (Alaska 2009). Because that theory implicates not only the State's police power but also its *parens patriae* power, the relevant balance of interests is different in those cases. And the State did not argue to the superior court — and does not argue now — that Luciano's illness posed any threat to himself.

[27] 384 P.3d 758, 762 (Alaska 2016).

denied doing so. He layered towels, cardboard, newspaper, and pillows over the house's windows and couch to protect himself from the neighbor's "tasing."[28]

On appeal, we concluded that the evidence supported a finding that Jacob was a danger to others. We focused in particular on Jacob's involvement "with both the rock and 'Molotov cocktail' incidents" and his delusions about his neighbor "manifesting in actions like 'setting dangerous booby traps, taking preemptive activities, or going to extreme measures to ensure security.' "[29]

In *In re Reid K.*, the respondent, who had been diagnosed with paranoid schizophrenia ten years earlier, experienced "delusions and severe command auditory hallucinations in the form of seven different voices that often instruct him to harm and kill other people, including members of his family and his home village."[30] In 2012, the year before the events leading to Reid's commitment, Reid tried to kill his brother with a sword.[31] By August 2013 Reid's hallucinations "had intensified and were telling him to carry out a mass murder, beginning with his family and continuing to each of the 400 residents of his village."[32] Reid obtained a firearm specifically for the purpose of carrying out this killing, but his plan was thwarted because the store Reid visited to buy ammunition did not have the correct type of bullets in stock.[33] At the commitment hearing, one of Reid's psychiatrists testified "that the only reason Reid did not carry out

---

[28] *Id.*

[29] *Id.* at 766.

[30] 357 P.3d 776, 777 (Alaska 2015).

[31] *Id.*

[32] *Id.* at 778.

[33] *Id.*

the planned village killings was because Reid did not have the bullets."[34] The trial court found Reid to be a danger to others and ordered him involuntarily committed; we dismissed Reid's subsequent appeal as moot because his period of commitment had expired.[35]

In *In re Dakota K.*, another appeal that was dismissed as moot, the respondent was committed on the basis that he was "likely to cause harm to others" after subjecting his father to a "reign of terror."[36] Over a span of approximately one month, Dakota had on several occasions "rammed the door [to his father's apartment] with a heavy metal tool or a cart," had threatened his father with a wrench, had "removed the key from [his father's] mobility scooter, leaving him immobilized," and had repeatedly sent text messages to his father "asking [him] whether he wanted to die and saying that [he] did not deserve to live."[37] While at API for an evaluation, Dakota continued to behave aggressively: he "threatened to 'shove soap down a staff member's throat' and warned another that he would cause 'a blood bath on this unit' if he did not receive his medication."[38]

In *In re Mark V.*, which was also dismissed as moot on appeal, the respondent was committed involuntarily on a finding that he was likely to cause serious harm to others.[39] The superior court "relied on the evidence of Mark's recent behavior,

---

[34]     *Id.* at 779.

[35]     *Id.* at 779-80.

[36]     354 P.3d 1068, 1069-70 (Alaska 2015).

[37]     *Id.*

[38]     *Id.* at 1070.

[39]     *In re Hospitalization of Mark V.*, 324 P.3d 840, 842-43 (Alaska 2014),
(continued...)

including evidence that he threatened a physician, [and] punched a [hospital] staff member."[40]

The common thread in all four of these cases — although the three dismissed as moot are of course not binding precedent — is that the respondent in each case either actively engaged in conduct that actually caused harm, planned or attempted to cause harm, or expressed a clear intent to cause harm. In other words, the respondents in those cases "demonstrated the affirmative ability or inclination to inflict harm to . . . another person."[41] By contrast, Luciano did not harm anyone, did not attempt to harm anyone, and did not make any threats — verbal or otherwise. His behavior may have been concerning to those interacting with him, but it did not rise to a level that would justify the State's exercise of its police power to confine him against his will.

## B. The Superior Court Did Not Give Due Consideration To Potential Less-Restrictive Alternatives To Involuntary Commitment.

Luciano also argues that the superior court erred in determining that no less restrictive facility was available that would adequately serve the State's interest in protecting Luciano and the public. The involuntary commitment statutes require that a commitment petition "allege that the evaluation staff has considered but has not found that there are any less restrictive alternatives available that would adequately protect the

---

[39]     (...continued)
*overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019).

[40]     *Id.* at 843.

[41]     *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 376 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019).

respondent or others."[42] In *In re Mark V.* we held that a corresponding finding that no less restrictive alternative is available is a constitutional prerequisite to involuntary commitment and "critical to the protection of the respondent's liberty interests."[43] We also explained that "[t]his is not a secondary concern, nor is it . . . something to be considered only after the court has decided that the respondent should be committed."[44]

In this case, Luciano expressed a clear preference for treatment at the VA over hospitalization at API. Luciano already had a history of treatment at the VA, where he had previously been evaluated and diagnosed with adjustment disorder. It is clear from the record that Dr. Blanford and other API staff members were aware of Luciano's existing relationship with the VA. But Dr. Blanford's testimony revealed that API's evaluation of Luciano did not include reviewing his mental health records from the VA, and it did not include speaking to Luciano's medical providers at the VA about his mental health history, what his treatment had been, or what treatment options might be available to Luciano at the VA as an alternative to involuntary commitment at a psychiatric facility.

The magistrate judge's findings on the record do not address what treatment options might have been available to Luciano at the VA or whether alternative treatment options would be effective. Rather, the magistrate judge focused entirely on Luciano's likelihood of complying with outpatient treatment, asserting that when asked "whether he would be willing to go to treatment, [Luciano] . . . distinguished between whether he was willing to go and whether he would go." On that basis, the magistrate judge concluded that "it doesn't sound like [Luciano] was necessarily going to follow up with

---

[42]    AS 47.30.730(a)(2).

[43]    375 P.3d 51, 58-59 (Alaska 2016).

[44]    *Id.*

psychiatric out-patient treatment." But the magistrate judge misstated Luciano's testimony. Luciano unambiguously testified that he was willing to "seek treatment through the VA" and that he was "willing to be evaluated by the VA." When asked whether he was "willing to take medication if [the VA] recommended medication," Luciano answered that he did not believe he needed medication, but he again reaffirmed that he "would go see a doctor," and that if released from API he would be attending a doctor's appointment at the VA the very next day.

The State had the burden to prove, *by clear and convincing evidence*, that there were no less restrictive alternatives available that would adequately protect Luciano and the public.[45] Luciano's testimony that he did not believe he needed medication does raise some questions about whether he would be medication compliant, but this alone was not sufficient to meet the burden of proof. I reiterate that "a mentally ill person's belief that [he] is not mentally ill cannot be the measure by which a court finds that there are no less restrictive alternatives."[46] Furthermore, "it is illogical and insufficient for a doctor to opine that there are no less restrictive alternatives when the doctor has done *nothing* to evaluate any less restrictive alternatives."[47] "Under these circumstances, where the testifying doctor[] utterly failed to make any effort to contact [Luciano's] prior treating physician . . . to explore less restrictive alternatives, I believe the doctor['s]

---

[45] *Id.*; *see also Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 185 (Alaska 2009) (holding in the involuntary medication context that "the court was *required* to evaluate whether [the respondent's] proposed alternative would be feasible and effective in promoting the same compelling state interests that justified API's proposed treatment" (emphasis added)).

[46] *In re Hospitalization of Joan K.*, 273 P.3d 594, 606 (Alaska 2012) (Stowers, J., dissenting).

[47] *Id.* (emphasis in original).

conclusory opinions are insufficient under any standard of proof to support the superior court's finding that no less restrictive option was available."[48]

## III. CONCLUSION

I conclude that the evidence on record was insufficient under a clear and convincing evidence standard to support a finding that Luciano was a danger to others and subject to involuntary commitment. Additionally, I conclude that the superior court clearly erred in failing to give due consideration to potential alternatives to involuntary commitment. For these reasons, I would reverse and vacate the superior court's order involuntarily committing Luciano for mental health treatment, and I respectfully dissent from the court's opinion.

---

[48] *Id.* at 607.