NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-17503 |
| QUADE M. | ) ) ) ) ) ) ) ) | Superior Court No. 3AN-19-01016 PR<br><br>MEMORANDUM OPINION<br>AND JUDGMENT*<br><br>No. 1828 – May 5, 2021 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Josie Garton, Judge.

Appearances: Courtney R. Lewis, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Quade M. Anna Jay, Assistant Attorney General, Anchorage, and Clyde "Ed" Sniffen, Jr., Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, and Maassen, Justices. [Carney and Borghesan, Justices, not participating.]

## I.      INTRODUCTION

Quade M.[1] has a history of mental illness. He appeals his most recent 30-day commitment order by arguing that the State failed to prove by clear and convincing evidence that he posed a risk of harm to others. At the commitment hearing, however,

---

\*        Entered under Alaska Appellate Rule 214.

[1]        We use pseudonyms to protect the identities of parties in commitment proceedings.

Quade's nurse practitioner at an evaluation facility testified that Quade had threatened staff, struck staff with his hands, and exhibited erratic and disorganized behavior. The nurse practitioner further testified that Quade posed a risk to the community. The magistrate judge recommended granting the commitment order and the superior court adopted the magistrate's recommendation. We affirm.

## II.    FACTS AND PROCEEDINGS

Quade was initially transported to Alaska Psychiatric Institute (API) following a court order authorizing hospitalization for evaluation. Soon after Quade's admission to API, API staff petitioned the superior court for a 30-day commitment order.

At a commitment hearing before a magistrate judge, the advanced nurse practitioner assigned to Quade's case testified at length about Quade's history and behavior while in API's care. The magistrate judge qualified the nurse practitioner as a mental health expert; Quade did not object. The nurse practitioner had served as Quade's psychiatric care provider starting when Quade was admitted to API two days prior and was also familiar with Quade from previous admissions.

The nurse practitioner confirmed Quade's longstanding diagnosis of schizoaffective disorder. At the time of the hearing, Quade's symptoms included "delusional thought content, grossly disorganized behavior, [and] disorganized speech." The nurse practitioner also reported "hyperverbal or excessive speech, flight of ideas, psychomotor agitation, and . . . high-risk behavior." The nurse practitioner said API staff had "had to redirect [Quade] numerous times for exposing his genitals in a public setting." He also testified that even though Quade was often responsive to redirection, he still had "episodes of aggression or threatening to harm staff."

The nurse practitioner testified that in the 24 hours before the hearing, Quade had threatened to "beat up a nurse" and had "punched" and "swatted at" other staff members. The nurse practitioner concluded that there was a "current risk of harm

to others" and that Quade's condition had not "changed substantially since he engaged in those behaviors." The nurse practitioner acknowledged that "outpatient psychopharmacological care would greatly improve [Quade's] prognosis" but cautioned that if Quade were released, there would be "a danger to the community in terms of harming someone."

Cross-examination highlighted the fact that the nurse practitioner had not personally witnessed any of the violent incidents that he described at the hearing, but Quade did not formally object to this testimony as hearsay. Quade also highlighted a discrepancy between the nurse practitioner's hearing testimony that Quade was "likely to cause harm to others" and the nurse practitioner's written evaluation that Quade "may or may not be likely in the future to cause physical injury as [Quade] ceases aggressive behaviors when redirected."

On redirect examination the nurse practitioner explained his prior assessment that Quade "may or may not be likely to cause physical injury" by saying, "I don't believe that I can predict the future." He further explained that given the "instances of physical aggression that [were] evident while hospitalized," there were "any number of things [that] could happen out in the community." The magistrate judge credited the nurse practitioner's testimony.

The magistrate judge recommended granting the 30-day commitment order. The magistrate judge found that Quade suffered from a mental illness causing him to be a "potential danger to others" based on evidence that Quade had "struck an individual, . . . made verbal threats to harm others, and in the mental health expert's opinion [was] likely to cause harm to others if released prior to finishing treatment."

Quade objected, arguing that the magistrate judge's recommendation failed to cite the "specific statutory ground" for commitment. He also argued that "the State did not present clear and convincing evidence that [he was] likely in the near future to

cause physical injury, physical abuse, or substantial property damage to another person." The nurse practitioner's testimony was insufficient, Quade argued, because the nurse practitioner did not witness any violent incidents firsthand and did not describe the incidents in sufficient detail.

The superior court overruled Quade's objections and adopted the magistrate judge's report. The superior court "evaluate[d] the evidence regarding [Quade]'s risk of harm under subsection (B),"[2] finding "that API presented clear and convincing evidence that [Quade] threatened, attempted, and actually assaulted staff" and was "likely in the near future to cause physical injury, physical abuse, or substantial property damage to another." The court determined that "[the nurse practitioner]'s testimony, which relied in part on treatment notes, was sufficiently detailed regarding [Quade]'s assaults on staff." According to the court, "the fact that professionally trained psychiatric staff were generally able to prevent [Quade's] threats, attempts, and actual harm of others" from further escalation did not "undercut" the proposition that releasing Quade into the community posed a risk of physical harm.

## III.  DISCUSSION

Alaska law allows for a 30-day commitment if, after a hearing, a court "finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others or is gravely disabled."[3] The commitment statutes do not define "likely to cause harm" but do define "likely to cause

---

[2]  Under AS 47.30.915(12)(B) a person is "likely to cause serious harm" if that person "poses a substantial risk of harm to others as manifested by recent behavior causing, attempting, or threatening harm, and is likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person."

[3]  AS 47.30.735(c).

serious harm."[4] We treat that definition as "relevant to interpretation of the commitment language."[5] Here the superior court relied on the statutory definition of "likely to cause serious harm" as describing a person who "poses a substantial risk of harm to others as manifested by recent behavior causing, attempting, or threatening harm, and is likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person."[6]

Quade argues that his conduct was not extreme enough to merit commitment under the statute and that the evidence of his conduct presented at the hearing was insufficient to meet a "clear and convincing" standard. We review the superior court's factual findings for clear error,[7] and we consider de novo "whether factual findings comport with the requirements of AS 47.30."[8]

Quade argues that his behavior did not rise to the same level of dangerousness as two recent cases in which this court affirmed commitment orders: *In re Hospitalization of Luciano G.*[9] and *In re Hospitalization of Jacob S.*[10] But this

---

[4]     *See* AS 47.30.915(12).

[5]     *E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1110 (Alaska 2009).

[6]     AS 47.30.915(12)(B). The two other definitions concern risk of harm to self and having a specific plan to cause harm. These are not at issue here.

[7]     *In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1262 (Alaska 2019).

[8]     *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019).

[9]     450 P.3d at 1263-64 (upholding commitment of man who behaved erratically at airport with loaded guns in an unlocked case).

[10]     384 P.3d 758, 766 (Alaska 2016) (affirming commitment after man set his
(continued...)

court's affirmance of commitment orders in more extreme situations does not imply that threats of lesser harm cannot support a commitment order. Additionally this argument misreads AS 47.30.915(12)(B). The statute reads "*substantial risk* of harm," not "risk of *substantial harm*."[11]

Quade also argues that because he did "not have violent ideation" and had historically stabilized after as few as three days on medication, the court should not have ordered him committed for 30 days. But neither statute nor precedent establishes a requirement of violent ideation. The magistrate judge's recommendation included consideration of Quade's medication history but credited the nurse practitioner's testimony that it could take a week or more for Quade to stabilize on his medication.

Quade makes several arguments attacking the sufficiency of the evidence. For a 30-day commitment, a court must "find[ ], by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm."[12] "Evidence is clear and convincing if it produces 'a firm belief or conviction about the existence of a fact to be proved.' "[13]

We have explained that "requiring this heightened standard of proof in involuntary commitment cases 'is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate

---

[10]    (...continued)
neighbor's house on fire with a Molotov cocktail).

[11]    AS 47.30.915(12)(B) (emphases added).

[12]    AS 47.30.735(c).

[13]    *In re Luciano G.*, 450 P.3d at 1262-63 (quoting *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1193 (Alaska 2013)).

commitments will be ordered.' "[14]    Accordingly, we have previously vacated a commitment order founded on "hearsay-upon-hearsay" after the superior court relied excessively on a past diagnosis while ignoring current conditions.[15]  But the evidence in this case is sufficiently detailed and reliable to meet the clear and convincing standard.

Quade argues that because the nurse practitioner was not present for any of the violent incidents he testified to, the superior court "had no context for what happened."  But Quade made no hearsay objection on the record.  And the nurse practitioner was testifying as an expert witness to the basis of his opinion about Quade: events at API witnessed by API staff members who described them to the nurse practitioner in his capacity as Quade's care supervisor.[16]  This is not the sort of patently unreliable evidence we have questioned in the past.[17]

Quade also claims that the nurse practitioner's written evaluation that Quade "may or may not" pose a risk of harm is too equivocal to support a dangerousness finding by clear and convincing evidence.  But the nurse practitioner explained his use of that language and reaffirmed his belief that Quade posed a risk to the community.  The

---

[14]    *In re Stephen O.*, 314 P.3d at 1193 (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 377 n.26 (Alaska 2007).

[15]    *Id.* at 1194-97.

[16]    *See In re Hospitalization of Rabi R.*, 468 P.3d 721, 732 n.22 (Alaska 2020) (explaining Alaska R. Evid. 703 entitled expert witness to rely on otherwise inadmissible facts or data of type reasonably relied upon by experts in field, and Alaska R. Evid. 705 permitted disclosure of those facts or data underlying the expert's opinion); *see also Pingree v. Cossette*, 424 P.3d 371, 378 (Alaska 2018) ("[E]xpert[s] . . . do not have to rely only on admissible evidence in forming their opinion, and evidence they rely on may be disclosed during [their] testimony.").

[17]    *See In re Stephen O.*, 314 P.3d at 1194 (questioning reliability of psychiatrist's recollection of grandfather's description of his granddaughter's statement that her father was "creeping [her] out" (alteration in original)).

superior court credited the nurse practitioner's testimony at the hearing despite the ambiguity. We give "[p]articular deference" to the superior court's determination of witness credibility,[18] and we decline to upset that determination in this case.

## IV. CONCLUSION

We AFFIRM the superior court's commitment order.

---

[18] *Gold Dust Mines, Inc. v. Little Squaw Gold Mining Co.*, 299 P.3d 148, 166-67 (Alaska 2012) ("The superior court may overlook inconsistencies and contradictions in testimony where the weight of the evidence counsels the court to do so.").